FILED IN OPEN COURT

JAN 15 2026

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **UNDER SEAL** |
| | ) | |
| v. | ) | Case No. 2:26-cr-7 |
| | ) | |
| JOHNEL LYNETTE BOND, | ) | 18 U.S.C. §§ 1347 & 2 |
| | ) | Health Care Fraud |
| a/k/a LYNETTE BOND, | ) | (Count 1) |
| LYNETTE GOLDEN, and | ) | |
| BOND JOHNEL, | ) | 18 U.S.C. §§ 1035 & 2 |
| Defendant. | ) | False Statements Relating to Health Care Matters |
| | ) | (Counts 2 – 8) |
| | ) | |
| | ) | 18 U.S.C. § 1028A(a)(1) |
| | ) | Aggravated Identity Theft |
| | ) | (Counts 9 – 10) |
| | ) | |
| | ) | Forfeiture |

**INDICTMENT**

JANUARY 2026 TERM – at Norfolk, Virginia

THE GRAND JURY CHARGES THAT:

**GENERAL ALLEGATIONS**

At all times material to the Indictment, unless otherwise stated:

Virginia Medicaid Program

1. The Virginia Medicaid Program ("Medicaid"), is a "health care benefit program" as defined by 18 U.S.C. § 24. Medicaid provides medical assistance to low-income individuals in Virginia who meet certain eligibility requirements. The United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare and Medicaid Services ("CMS"), and the Commonwealth of Virginia, Department of Medical Assistance Services

1

("DMAS") administer and supervise the administration of the Medicaid program in Virginia, which is called the Virginia Medical Assistance Program ("VMAP"). Funding for Medicaid comes from both the United States and the Commonwealth of Virginia.

2. Individuals and patients who receive benefits under Medicaid are commonly referred to as "beneficiaries" or "recipients."

3. Medicaid healthcare benefits and services are delivered to beneficiaries through contracted arrangements between DMAS and managed care organizations ("MCO"). The MCOs compensate health care providers, such as doctors, hospitals, and home health care agencies, for services provided to Medicaid recipients. A health care provider can participate in the Medicaid program if it has a valid participation agreement with Medicaid agreeing that it will: (1) provide the service, (2) submit an accurate claim, and (3) accept as payment in full the amount paid by Medicaid.

4. Health care providers also must agree to keep such records as are necessary to document the services provided to Medicaid recipients, and to furnish such information to Medicaid upon request; to render and perform services that are in accordance with federal and state law and applicable regulations; and to only submit to Medicaid claims that comply with Medicaid's rules and regulations.

5. Providers further must agree to only submit claims for services they actually provide to a Medicaid recipient. Each time a provider submits a claim to Medicaid, the provider certifies that the claim is true, correct, and complete, and complies with all Medicaid rules and regulations.

### Medicaid Coverage of Personal and Respite Care Services

6. DMAS authorizes health care providers to furnish "personal care services" to eligible Medicaid recipients. Personal care services are designed to enable recipients to remain in

2

their homes rather than entering a nursing facility, an assisted living facility, or a hospital. Personal care services provide eligible individuals with a home health aide (known as a "personal care attendant" or "PCA") who performs basic health-related services, such as help with walking/wheeling exercises, self-administered medications, and household chores essential to health in the home. Specifically, personal care services include assistance with personal hygiene, eating, walking, meal preparation, feeding, taking, and recording vital signs, nutritional support, and the home maintenance necessary for recipients to remain in their own homes or the community.

7. The home health care agency is also responsible for recruiting, interviewing, hiring, training, directing, and supervising all PCAs.

8. The maximum amount of personal care services an eligible Medicaid recipient can receive is eight hours per day, for a maximum of fifty-six hours per week or approximately 2,912 hours on an annual basis.

9. A recipient requiring additional personal care service hours beyond this limit must receive them from the recipient's unpaid primary caregiver (usually a family member). An unpaid primary caregiver is the primary person who consistently assumes the primary role of providing direct care and support to the Medicaid recipient without receiving compensation for doing so.

10. "Respite care services" are additional personal care service hours given by health care providers through a PCA. Respite care is specifically designed to give temporary substitute care to the Medicaid recipient that would normally be provided by an unpaid primary caregiver of that Medicaid recipient. Respite care is for the relief of the caregiver due to the physical burden and emotional stress of providing continuous support and care to the recipient. These

services are provided on a short-term basis to provide coverage during the unpaid primary caregiver's emergency absence, or for routine or periodic relief of the unpaid primary caregiver.

11. To be eligible for respite care services, the Medicaid recipient must have a designated unpaid primary caregiver. A Medicaid recipient without an unpaid primary caregiver can only receive personal care services, not respite care services, from a health care provider. If the primary caregiver for the Medicaid recipient receives payment for providing personal care services to the individual, then the recipient is ineligible for respite care services.

12. DMAS will approve and reimburse up to 480 hours of respite care services annually, in addition to the annual maximum of 2,912 personal care service hours, but will only do so when the recipient's unpaid primary caregiver requests relief.

13. "Agency-Directed" is a service delivery model for personal and respite care services authorized under DMAS, through which the recipient chooses to a home health care agency to provide the personal and respite care services. The home health care agency is responsible for employing PCAs, maintaining records of the nature, scope and detail of the services provided, and scheduling the dates and times of the PCAs' presence in the Medicaid recipient's homes for providing personal and respite care service hours.

Personal and Respite Services to More than One Individual in the Same Household

14. Medicaid recipients eligible to receive personal care services may elect to reside in a residence with other such recipients, rather than entering a nursing facility, an assisted living facility, or a hospital. This shared residence is considered the recipient's personal home.

15. Recipients living in the same household or residence may receive personal care and respite care services through the same home health care agency. When this occurs, tasks such as meal preparation, cleaning shared spaces, laundry, and shopping—considered Instrumental Activities of Daily Living (IADLs)—must be provided for all recipients in the

shared residence simultaneously. For specific IADL tasks performed simultaneously for multiple recipients in the shared residence, timesheets for the benefitted recipients must reflect those service hours as shared services hours.

16. Personal care and respite care service hours, however, cannot be provided simultaneously by the same PCA to multiple recipients. For each recipient in a shared residence, the timesheets submitted by the PCAs and home health care agency to DMAS MCOs must clearly indicate the specific personal care or respite care service hours provided separately to each recipient.

## Registered Nurse Requirements

17. The home health care agency must employ and directly supervise a Registered Nurse (RN) who provides ongoing supervision of all PCAs. The home health care agency manages and evaluates the work of each PCA and keeps track of services provided by the PCA and establishes a system for signing and submitting timesheets.

18. The home health care agency is paid based on the number of hours the PCA provides care to the Medicaid recipient. It is the responsibility of the home health care agency to verify the PCA's reported hours worked as well as to make sure that timesheets are accurate and fully completed before they are submitted to DMAS for Medicaid reimbursement payments.

19. For a home health care agency to be eligible for reimbursement for personal care and respite care services, the provider must request a Uniform Assessment Instrument (UAI) for the Medicaid recipient from an agency such as the Virginia Department of Social Services (DSS) or a local community service board (CSB). The UAIs must be completed by a case manager or qualified Human Services Agency Assessor.

20. The home health care agency is also responsible for having an RN make a Community-Based Care Assessment (DMAS-99) and a Plan of Care (DMAS-97 A/B) of the recipient to determine the eligible number of personal care service hours, respite care eligibility, and needed services. The home health care agency then submits the UAI, Care Assessment, and Plan of Care completed by the RN to the appropriate DMAS MCO for review and authorization. The home health care agency must receive approval from the DMAS MCO before they can be reimbursed for personal care and respite care services provided to Medicaid recipients.

## Medicaid Billing Process

21. To receive reimbursement for covered services, the home health care agency must submit a claim to the assigned DMAS MCO for the recipient. DMAS MCOs include Aetna, Anthem, Magellan, Optima Health, United Health Care, and Virginia Premier. PCA timesheets and claims are sent electronically by wire. After the claim has been processed and approved, payment for the service is sent to the provider by the corresponding DMAS MCO.

22. The PCA timesheet contains information specific to each Medicaid care recipient and details the service dates, service hours, and type of services provided to that recipient by the PCA. These biweekly time-entries must be signed, dated, and approved by both the home health care agency and the PCA after the personal or respite care service hours have been provided to the recipient.

23. The MCOs receive and process all claims and make payments to the home health agency through issuing paper checks or electronic funds transfers. Neither DMAS nor the MCOs confirms the validity of the home health agency representations on submitted claims; instead, the PCA submitting the claim attests to the accuracy of each claim under penalty of law, and the

home health care agency approves the timesheets as accurate representations of the hours actually worked.

<u>The Defendant, First Priority Home Health, and Safe Haven Residential</u>

24. From on or about January 4, 2017, through at least on or about December 31, 2023, the defendant, JOHNEL LYNETTE BOND, solely owned and operated First Priority Home Health ("First Priority"). First Priority was a home health care agency with multiple locations in the Hampton Roads region, which is within the Eastern District of Virginia. BOND held exclusive ownership, control, and authority over First Priority, including its billings to DMAS.

25. On or about January 4, 2017, BOND, on behalf of First Priority, entered into Medicaid Participation Agreements with DMAS in order to submit claims to Medicaid for providing Agency-Directed respite care, personal care, private duty nursing, and other home health services. BOND certified that she agreed, among other things, to comply with all state and federal laws and regulations as well as applicable policies and procedures of the Medicaid program.

26. BOND commenced submitting bills to DMAS for First Priority on or about January 27, 2017, and continued such billings through on or about December 31, 2023.

27. From on or about January 4, 2017, through at least on or about December 31, 2023, the defendant, JOHNEL LYNETTE BOND, solely owned and operated Safe Haven Residential, LLC ("Safe Haven"). Safe Haven is a home health care agency with multiple locations in the Hampton Roads region, which is within the Eastern District of Virginia. BOND holds exclusive ownership, control, and authority over Safe Haven, including its billings to DMAS.

28. On or about July 11, 2023, BOND, on behalf of Safe Haven, entered into Medicaid Participation Agreements under the same name, with DMAS in order to submit claims to Medicaid for providing Agency-Directed respite care, personal care, private duty nursing, and other home health services. BOND certified that she agreed, among other things, to comply with all state and federal laws and regulations as well as applicable policies and procedures of the Medicaid program.

29. BOND commenced submitting bills to DMAS for Safe Haven on or about November 21, 2023, and continued such billings through at least on or about March 9, 2024, when the Virginia Office of the Attorney General – Medicaid Fraud Control Unit ("MFCU") last obtained billing records for Safe Haven from DMAS.

30. BOND leased multiple residential homes in Portsmouth, Virginia; Chesapeake, Virginia; Norfolk, Virginia; and Suffolk, Virginia—each within the Eastern District of Virginia. BOND operated these properties as shared personal residences for Medicaid recipients who were under the care of First Priority and Safe Haven. BOND charged the Medicaid recipients living in these homes to pay rent of up to $1,600 per month for a single room within the shared residence. At all relevant times, multiple Medicaid recipients resided in each of these shared residences leased and managed by BOND.

31. At all times material to this Indictment, BOND was a resident of Portsmouth, Virginia, Virginia Beach, Virginia, and Chesapeake, Virginia, all within the Eastern District of Virginia.

## COUNT ONE
### Health Care Fraud

32. The allegations in the foregoing paragraphs of this Indictment are re-alleged and incorporated as though set forth in full here.

8

33. From on or about January 4, 2017, through at least on or about March 9, 2024, in the Eastern District of Virginia, the defendant, JOHNEL LYNETTE BOND, a/k/a LYNETTE BOND, a/k/a LYNETTE GOLDEN, a/k/a BOND JOHNEL, did knowingly and willfully execute and attempt to execute a scheme and artifice to commit health care fraud, that is, to defraud a health care benefit program, including Medicaid, DMAS, and VMAP, health care benefit programs as defined by Title 18, United States Code, Section 24(b), and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money owned by, and under the custody and control of those health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, and aided and abetted the same.

34. The object and purpose of the scheme and artifice devised and executed by the defendant was to obtain health care benefit payments from Medicaid to which the defendant was not entitled.

### Overview of the Scheme

35. BOND, through First Priority and Safe Haven, submitted false and fraudulent claims to Medicaid for respite care and personal care services which were not legally authorized, never provided to Medicaid recipients, not authorized by the Medicaid recipients, or provided to ineligible Medicaid recipients.

36. As a result of these false submissions, DMAS and its MCOs paid funds to which BOND and her companies were not entitled. As a result of the scheme to defraud, BOND obtained approximately $1,982,117.86 to which she was not entitled.

### The Manner and Means of the Scheme to Defraud

37. The manner and means by which BOND sought to accomplish the fraudulent scheme included the following:

9

a. BOND billed for respite care services where none were actually provided or where none were legally authorized, for example because there was no unpaid care giver, as further described below.

b. BOND billed for services that were never provided, or where none were legally authorized, as further described below, including:

   i. Billing for services that were never provided, including after the recipient had left her agency and was no longer in her care;

   ii. Using fictitious names for PCAs on electronic timesheets, or using the names of PCAs without their knowledge or authorization after they left employment of her agency;

   iii. Double-billing for overlapping/duplicative hours; and

   iv. Billing separately for each recipient living in the same home where personal care was being provided simultaneously by only one PCA.

c. BOND submitted and caused to be submitted to DMAS false, fraudulent, and fictitious claims to DMAS and its MCO contractors for services provided to Medicaid recipients based on fraudulent Community-Based Care Assessments and Plans of Care. She billed for services which required a Community-Based Care Assessment and Plan of Care completed by an R.N., when she in fact had no R.N. on staff and/or forged the credentials of an R.N. who was previously on staff. The Community-Based Care Assessments and Plans of Care consistently utilized personal identifying information of the Medicaid recipients and purported R.N. employed by BOND's companies, despite BOND only employing one R.N. for a very brief period in 2017. Rather than employing R.N.'s as required by

DMAS rules, BOND falsified signatures of the purported R.N.'s on the Community-Based Care Assessments and Plans of Care.

*Respite Care Fraud*

38. It was part of the fraudulent billing scheme that the defendant submitted and caused to be submitted to Medicaid claims for payment, representing that respite care services had been provided to Medicaid recipients, when, in truth and fact, as the defendant knew, no such services had actually been provided or were improperly determined because (a) the recipients were not eligible for respite care services or (b) the respite care services were not authorized. BOND accomplished the scheme in the following ways:

 a. BOND submitted and caused to be submitted false timesheets and claims to DMAS and its MCOs representing that respite care services had been provided to Medicaid recipients living in homes she leased and managed. In truth and in fact, those residents did not have unpaid primary caregivers—as the recipients lived in BOND's rental homes only with other recipients—and, therefore, were ineligible for respite care reimbursement.

 b. BOND fabricated plans of care and assessments, falsely listing fictitious or non-existent unpaid caregivers. BOND listed fictious persons, acquaintances, or paid PCAs as "unpaid caregivers," when in fact those individuals never provided unpaid care or were compensated for personal care services.

 c. BOND caused the submission of timesheets claiming that PCAs had provided respite care in addition to personal care, even though the PCAs were paid employees who never served in an unpaid capacity.

 d. BOND billed for respite hours more than 480 hours per year, exceeding the Medicaid limit and without any documented request for caregiver relief.

11

    e. BOND submitted false claims for respite care after recipients had moved out of the shared personal residences that rented out to the recipients or after personal care services had been terminated by the recipients, thereby billing for services that could not have been rendered.

39. To conceal the fraud, BOND used the identities of fictious persons or acquaintances to submit false PCA timesheets to DMAS MCOs, falsely representing that those individuals had provided respite care services to recipients when in fact they had never provided such care.

### *Services Not Provided/Personal Care Fraud*

40. It was also part of the fraudulent billing scheme that the defendant falsely and fraudulently billed Medicaid for personal care services purportedly provided to Medicaid recipients by submitting knowingly false timesheets to Medicaid seeking reimbursement for personal care services provided by certain PCAs to Medicaid recipients when those Medicaid recipients had not, in fact, received such services from the purported PCA. BOND accomplished the scheme in the following ways:

    a. Numerous of the PCAs listed in these timesheets did not provide any personal care services to the patients-that is, those PCAs did not assist any Medicaid recipient with the activities of daily living, including bathing, eating, toiletry, taking medication, and cleaning the house.

    b. In numerous instances, PCAs identified on the timesheets were fabricated persons or had never worked for BOND through First Priority or Safe Haven or were former employees who had long since left the agencies. BOND used acquaintances' names or identities to create the appearance of legitimate staffing of PCAs.

c. BOND caused the submission of overlapping and duplicate timesheets, showing that multiple PCAs had allegedly provided care to the same recipient at the same time, or that the same PCA had provided care to multiple recipients simultaneously.

d. BOND submitted duplicate claims for identical service hours, changing only the name of the PCA, to receive double reimbursement for the same service.

e. BOND also caused timesheets to be submitted for periods when the recipients had moved out of her group homes or after their Medicaid service agreements with her agencies had been terminated.

f. BOND failed to indicate shared service hours, thereby double billing for services provided to multiple recipients during the same period.

g. BOND submitted both personal care and respite care claims for the same dates and times, using different PCA names to disguise the duplication. For example, BOND used multiple variants of her own name, including LYNETTE BOND, LYNETTE GOLDEN, and BOND JOHNEL, as well as multiple variants of a family member's name who worked for her.

h. To support her false claims, BOND issued or caused to be issued fraudulent PCA certificates in the names of individuals whose identities she used to submit claims. These individuals either did not know their names were used or never worked as PCAs for her companies.

(In violation of Title 18, United States Code, Sections 1347 & 2.)

## COUNTS TWO THROUGH EIGHT

41. The allegations in the foregoing paragraphs of this Indictment are re-alleged and incorporated as though set forth in full here.

42. On or about the dates set forth below, in the Eastern District of Virginia and elsewhere, the defendant, JOHNEL LYNETTE BOND, a/k/a LYNETTE BOND, a/k/a LYNETTE GOLDEN, a/k/a BOND JOHNEL, in a matter involving a health care benefit program as defined in Title 18, United States Code, Section 24(b), knowingly and willfully did falsify, conceal, and cover up by a trick, scheme, or device a materials fact, and did make a materially false, fictitious and fraudulent statement and representation, and make and use a materially false writing and document knowing the same to contain a materially false, fictitious and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services, in that the defendant submitted and caused to be submitted to the Virginia Medicaid program, known as the Department of Medical Assistance Services, the following claims for health care benefit payments, and aided and abetted the same. Each claim is a separate count of this indictment as indicated:

| Count | Date of Claim/Payment | Dates Of Service | Type Of Services | Recipient |
|---|---|---|---|---|
| 2 | 4/5/2022 | 2/23/2022-3/15/2022 | Personal Care | A.S. |
| 3 | 7/23/2022 | 4/1/2022-6/30/2022 | Respite Care | A.S. |
| 4 | 5/17/2022 | 03/28/2022 – 4/17/2022 | Respite Care | M.M. |
| 5 | 4/5/2023 | 3/2/2023-3/15/2023 | Respite Care | C.S. |
| 6 | 7/6/2023 | 06/18/2023 – 06/22/2023 | Personal Care | C.S. |
| 7 | 2/3/2024 | 12/1/2023-1/13/2024 | Personal Care | C.E. |
| 8 | 3/16/2024 | 12/1/2023-12/27/2023 | Respite Care | C.E. |

(In violation of Title 18, United States Code, Sections 1035 & 2.)

## COUNTS NINE AND TEN
### Aggravated Identity Theft

43.  The allegations in the foregoing paragraphs of this Indictment are re-alleged and incorporated as though set forth in full here.

44.  On or about the dates set forth below, in the Eastern District of Virginia, JOHNEL LYNETTE BOND, the defendant, did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, that is the Medicaid identification number of the person indicated, during and in relation to a felony enumerated in 18 U.S.C. § 1028A(c), namely, health care fraud in violation of 18 U.S.C. § 1347, as charged in Count One of this indictment. Each claim is a separate count of this indictment as indicated:

| Count | Dates | Description |
|---|---|---|
| 9 | 3/18/2018 – 2/1/2024 | Use of RN T.L.'s name for plans of care for numerous recipients without T.L.'s knowledge or consent, and despite T.L. not being employed by or affiliated with BOND's companies |
| 10 | 4/1/2022 – 7/17/2023 | Use of PCA T.J. a/k/a T.B.'s name for billings for numerous recipients without T.J.'s knowledge or consent, and despite T.J. not being employed by or affiliated with BOND's companies |

(In violation of Title 18, United States Code, Section 1028A(a)(1).)

## **FORFEITURE**

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT:

Pursuant to Rule 32.2(a) Fed. R. Crim. P., defendant, JOHNEL LYNETTE BOND, is hereby notified that upon conviction of any of the offenses alleged in Counts One through Eight of this Indictment, she shall forfeit to the United States any property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

The property subject to forfeiture includes but is not limited to a sum of money of at least $1,982,117.86, which represents the gross proceeds of the scheme charged obtained by the defendant and which shall be reduced to a money judgment against the defendant in favor of the United States.

If any property that is subject to forfeiture above it not available, it is the intention of the United States to seek an order forfeiting substitute assets pursuant to Title 21, United States Code, Section 853(p) and Federal Rule of Criminal Procedure 32.2(e).

(All in accordance with Title 18, United States Code, Section 982(a)(7) and Title 21, United States Code, Section 853(p)).

United States of America v. JOHNEL LYNETTE BOND
2:26-cr-____

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.

A TRUE BILL:

REDACTED COPY

_____
FOREPERSON

LINDSEY HALLIGAN
UNITED STATES ATTORNEY AND SPECIAL ATTORNEY

TODD W. BLANCHE
DEPUTY ATTORNEY GENERAL

By: _____
E. Rebecca Gantt
Assistant U.S. Attorney
United States Attorney's Office
101 W. Main St., Suite 8000
Norfolk, VA 23510
Phone (office): (757) 441-3554
Email: rebecca.gantt@usdoj.gov